L. J. UPTON & COMPANY, Inc. *vs.* GEORGE M. COLBATH et al.

Aroostook.    Opinion January 22, 1923.

*It is reversible error to order a nonsuit where the question involved is as to whether there was a completed oral contract, being a question of fact for the jury, and where there is sufficient evidence supporting such contract to sustain a verdict for plaintiff, should one be so rendered by a jury, and also if there was a sufficient memorandum of such contract signed by the party to be charged to remove it from the statute of frauds.*

In the instant case the question whether there was a completed oral contract between the parties rather than merely a preliminary negotiation looking forward and leading up to a written contract to be made and executed later, was one of fact for the jury.

There was sufficient evidence supporting the existence of such an oral contract to sustain a verdict for the plaintiff in case the jury so found.

If the jury found the existence of such an oral contract there was a sufficient memorandum of it signed by the party to be charged to take the contract out of the statute of frauds.

On exceptions by plaintiff.    An action on the case to recover damages for breach of contract to deliver at Norfolk, Virginia, 5,000 barrels of potatoes at $6.75 per barrel.    The plaintiff, a corporation, doing business at Norfolk, Virginia, on March 1, 1920, wired F. W. Higgins & Company of Boston, Mass., a potato brokerage firm, requesting a quotation on 10,000 barrels of potatoes, said brokerage firm having also an office at Fort Fairfield in Aroostook County, where at this time, F. W. Higgins a member of firm was, Edward P. Higgins another member of the firm being at the Boston office, and F. W. Higgins having been informed of the requested quotation of plaintiff, called by telephone, George M. Colbath, one of the defendants, and a member of the partnership doing business at Presque Isle, and had a conversation with him relative to the order from plaintiff, and plaintiff claims that by that conversation an agreement was made for the sale by defendants to plaintiff of 5,000 barrels of potatoes at $6.75 per barrel delivered at Norfolk, Virginia, between March 15 and April 15, and a deposit of $1.00 a barrel to be made by plaintiff on signing of the contract.

On the same day the broker drafted in duplicate a contract embracing the conditions and terms of the alleged telephone agreement and mailed it to defendants, and also wrote to plaintiff informing it of the alleged telephone agreement. Defendants returned the written contract to the broker without execution objecting to the description therein of the potatoes to be shipped, and the broker made a change covering the objection made by defendants, and drew a new contract in duplicate embracing the change made, and mailed it to defendants. Mr. Colbath before executing the new contract for the defendants interlined with a pen a clause covering inability to procure cars, and then mailed to plaintiff the typewritten contract signed by defendants, who on its receipt drew a pen through the interlineation made by defendants, and interlined with a pen a clause materially different, and then signed it, it being March 22, and sent the contract and a check for $5,000 to the broker at Boston to be given to defendants. On March 31 defendants wired plaintiff cancelling the contract and two days later returned the check. The defendants pleaded the general issue and under a brief statement set up the statute of frauds. At the close of the testimony by the plaintiff, counsel for the defendants moved for a nonsuit which was granted, and plaintiff excepted. Exceptions sustained.

The case is fully stated in the opinion.

*Charles P. Barnes,* for plaintiff.

*Cook, Hutchinson & Pierce and Carl A. Weick,* for defendants.

SITTING: CORNISH, C. J., SPEAR, PHILBROOK, DUNN, MORRILL, WILSON, DEASY, JJ.

MORRILL, J., did not concur.

CORNISH, C. J. Action on the case to recover damages for breach of contract to deliver 5,000 barrels of potatoes at Norfolk, Virginia, at $6.75 per barrel. The case is before the Law Court on plaintiff's exceptions to the order of a nonsuit.

The sequence of events is as follows: Plaintiff corporation is engaged in the fruit and produce business at Norfolk, Virginia. Defendants are potato dealers in Aroostook County, Maine. Frederick W. Higgins is a member of the potato brokerage firm of F. W. Higgins & Company, located in Boston, Mass.

On March 1, 1920, Mr. Upton wired Higgins & Company for a quotation on 10,000 barrels of Aroostook potatoes. Mr. Edward Higgins, one of the firm, quoted a price on 5,000 barrels on that day, and Mr. Upton accepted it. Mr. F. W. Higgins was then in Fort Fairfield, Maine, and having been informed of the Upton order he had a telephone conversation with Mr. Colbath on the same day. This conversation as narrated by Mr. Higgins was as follows:

"I told Mr. Colbath that I had an order for several thousand barrels of potatoes for L. J. Upton & Company, and I asked him if he wanted to sell them 5,000 barrels for shipment to commence March 15 and end April 15, price to be $6.75 a barrel delivered at Norfolk, Virginia, and a deposit of one dollar a barrel at the signing of the contract and he said he would."

Thereupon Mr. Higgins sent the following letter to Upton & Company:

"Fort Fairfield, Me., March 1, 1920.

L. J. UPTON & Co.,

        Norfolk, Va.

Gentlemen:

Regarding the 5,000 barrels of white stock sold to you through our Boston office today, to be shipped by G. M. Colbath of Presque Isle, will say that we confirm same to you.

Mr. Colbath will be away until the last of this week and we are mailing contract to his office at Presque Isle to be signed by him and will be forwarded to you not later than next Monday. Mr. Colbath's partner is also away and there is a possibility of his returning by the middle of the week; if so he will sign contract and forward it at that time.

                Very truly yours,

                        F. W. HIGGINS & Co."

On the same day and "immediately after the sale" Mr. Higgins drafted a memorandum of agreement in duplicate and mailed both copies that evening to Mr. Colbath. Mr. Colbath returned the

drafts as he objected to the designation of the potatoes as "U. S. Grade No. 1," and wished the word "merchantable" substituted therefor. Mr. Higgins then rewrote the document in duplicate, making the substitution requested, but changing no other terms, and sent them back to Mr. Colbath a few days later. This memorandum was in these terms as it left Mr. Higgins:

"Memorandum of Agreement made and entered into this first day of March, 1920, Colbath and Watson of Presque Isle, in the State of Maine, party of the first part, and L. J. Upton & Co. of Norfolk in the State of Virginia, party of the second part.

"Party of the first part does hereby sell and agree to deliver to party of the second part, five thousand (5,000) barrels of merchantable white potatoes for table stock, free from frost and disease, at the sum of six dollars and seventy-five cents ($6.75) per barrel delivered Norfolk, Virginia. If said Upton wants potatoes in sacks a charge of thirty (30) cents extra is to be paid for each sack.

"Party of the second part buys and agrees to accept said potatoes at the above stated price, same to be paid for in the manner following: One dollar ($1.00) per barrel as a deposit upon the signing of this contract, balance upon receipt of draft attached to bill of lading.

"It is further agreed that the deposit of $1.00 per barrel shall be equally applied against the number of barrels loaded in each car.

"Party of the first part is to ship said potatoes as follows: Shipment from March 15, 1920, to April 15, 1920, shippers option.

"Obligation of party of first part to deliver is contingent upon strikes, embargoes, unavoidable accidents and weather conditions beyond his control.

"In Witness Whereof the said parties have hereunto set their hands and seals the day and year above written."

Mr. Colbath on receiving this new draft interlined with a pen after the word "embargoes" in the last paragraph, the words "inability to get cars to ship in during the life of this contract." He then signed one of the documents "Colbath and Watson, by G. M. Colbath," and mailed it to Upton and Company at Norfolk. On receiving it, Upton & Company ran a pen through the interlineation made by Mr. Colbath, and inserted another after the word "control" in the same paragraph, viz.: "or inability to get cars to ship in during the life of this contract in which event shipments are to be made as fast as possible thereafter as cars can be secured." Then

Upton & Company signed it and on the same day it was signed, March 22, they sent the memorandum with the check 'for $5,000 to Mr. Higgins in Boston to be given to Mr. Colbath.   Mr. Higgins however  returned it to Upton & Company and they then sent the memorandum and check on March 26, to Mr. Colbath.   On March 31, Colbath from Boston wired plaintiff cancelling the contract, and on April 1, sent this letter of confirmation:

"DEAR SIRS:

Inclosed find your check returned.   Wired you from Boston last night cancelling contract.   Can't accept for reasons of .changes you made and delay in receiving check.

Yours truly,

G. M. COLBATH."

By inadvertence the check was not enclosed but was sent on the following day, April second.   This ended the transaction.   No potatoes were shipped and this action was the result.

Two main questions are involved.

First, was a complete oral contract made between the parties on March 1, or was that merely a preliminary negotiation looking forward and leading up to a written contract to be made and executed later?

Second:   If the oral contract was complete on March 1, is there a sufficient memorandum of it signed by the party to be charged to take it out of the Statute of Frauds?

I.   The first question is one of fact, largely one of intention, to be determined under all the evidence and circumstances in the case. *Wharton* v. *Stoutenburg*, 35 N. J. Eq., 266; *Berman* v. *Rosenburg*, 115 Maine, 19.   The second is one of law for the court.   The question of fact was taken from the jury by the order of nonsuit.   Was this ruling correct?

This court, in the leading case of *Mississippi and Dominion Steamship Co.* v. *Swift*, 86 Maine, 248, after a very extensive and analytical review of English and American authorities bearing on the subject

of the completeness or incompleteness of an oral contract in view of its subsequent reduction to writing, drew from them these governing principles:

"From all these expressions of Courts and jurists it is quite clear that, after all, the question is mainly one of intention. If the party sought to be charged intended to close a contract prior to the formal signing of a written draft, or if he signified such an intention to the other party, he will be bound by the contract actually made, though the signing of the written draft be omitted. If, on the other hand, such party neither had nor signified such an intention to close the contract until it was fully expressed in a written instrument and attested by signatures, then he will not be bound till the signatures are affixed. The expression of the idea may be attempted in other words: if the written draft is viewed by the parties merely as a convenient memorial or record of their previous contract, its absence does not affect the binding force of the contract; if, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed."

The opinion then goes on and suggests various circumstances and considerations as helpful in reaching a conclusion on the disputed point, viz.:

"In determining which view is entertained in any particular case, several circumstances may be helpful as: whether the contract is of that class which are usually found to be in writing; whether it is of such a nature as to need a formal writing for its full expression; whether it has few or many details; whether the amount involved is large or small; whether it is a common or unusual contract; whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations. If a written draft is proposed, suggested or referred to during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract."

The plaintiff contends that utilizing these suggested tests and considering the facts and circumstances in the case at bar, the contract between the parties was intended to be and was concluded when the conversation, already quoted, took place between Mr. Higgins and Mr. Colbath on March 1st; that their minds met then and there on all the essential elements of the trade, and that the subsequent written memorandum was looked upon by the parties

merely as "a convenient memorial or record of their previous contract.". There are strong arguments in favor of this contention.

The oral contract did contain all the essential elements,—the names of the contracting parties, vendors and vendee; the goods to be sold, potatoes; the quantity, 5,000 barrels; the price, $6.75 per barrel; the place of delivery, Norfolk, Virginia; the time of delivery, from March 15 to April 15; the initial payment, one dollar per barrel; the time of making that initial payment, at the signing of the contract. What more was needed to constitute a full and complete agreement? Some minor details might be thought of later and inserted in a memorandum, but their omission or insertion could not affect the integrity of the contract already entered into. The law fixes no legal standard as to the minuteness of details required in a valid contract. The essentials must be agreed upon, and the plaintiffs claim that they were in this case. In answer to the question whether Mr. Colbath recited any conditions other than those mentioned Mr. Higgins replied that he did not. The conversation therefore as quoted constitutes the entire oral contract and it was sufficient at common law.

Now, applying seriatim the tests suggested in the Steamship Company case, the plaintiff insists that they should be resolved in its favor. It says that,

First, the contract is not of that class usually found to be in writing, but, as Mr. Upton testified, without contradiction, that it is the custom in Aroostook County to sell potatoes by telegraph or telephone, afterwards confirming the sale in writing.

Second, that the contract was not of such a nature as to require a formal writing for its expression, like that in the Steamship Company case which involved a voluminous correspondence continuing from November, 1889, to October, 1891, a period of nearly two years, and where the negotiations concerned the use of space on ocean steamers, of which the shippers were to have partial control, and in which they were to set up their own appliances and load and care for their own merchandise, and which contemplated not merely one area of space on a single steamer for a single voyage, but was to be for a year, and for different areas of space on three different steamers. Such complicated negotiations would naturally necessitate a long and carefully drafted written contract to protect the varied interests of the parties, as the court there held. Here the contract was an uncomplicated

trade for the sale and delivery of a certain quantity of a single kind of merchandise at a given price and at a stated time and place.

Third, that it comprised few details.

Fourth, that it is not an unusual contract but an ordinary and common one, such as is made very frequently in Aroostook County during the potato season.

Fifth, on the proposition whether the negotiations themselves indicate that a written draft was contemplated as the consummation of the contract, the plaintiff argues that nothing whatever was said in the course of the negotiations about a written document except in connection with the time of making the initial payment, and that while that mention constituted some evidence to the contrary, as the Steamship Company case holds, yet its weight under all the other circumstances was for the jury, and that the jury would have the right to find that the contract alluded to, that is, the written instrument to be signed, was to be merely the memorial of a previously concluded agreement. In support of that claim is the fact that the memorandum of agreement itself bears the very date, March 1st, when the conversation took place, and not the date many days after when it was actually signed. In the Steamship Company case the draft was prepared midway of the negotiations, bore date simply "Montreal 1890," and was never signed.

There is force in the contention that in this respect this case falls in line with those like *Bournewell* v. *Jenkins*, 8 Ch. Div., 70, cited in the Steamship Company case, where the defendants' agents offered certain premises for sale and the plaintiff wrote the agents making an offer of eight hundred pounds for the estate. The agents replied: "We are instructed to accept your offer of eight hundred pounds for these premises and have asked Mr. Jenkins' solicitor to prepare contract." The court held that the contract was concluded by the correspondence, and Thesiger, L. J., said: "The mere reference to a preparation of an agreement, by which the terms agreed upon would be put into a more formal shape, does not prevent the existence of a binding contract."

So much for the contentions of the plaintiff.

The defendants on the other hand strenuously urge that neither party had or manifested an intention to close the contract until it was fully expressed in a written instrument duly executed, and as the written instrument in this case is obviously invalid as a contract,

because the defendants executed it after making an interlineation to which the plaintiff would not agree, and the plaintiff signed it after striking out the defendants' interlineation, and inserting another to which the defendants would not agree, there is no subsisting contract either oral or written binding upon the parties.

In support of their claims as to intention, the defendants rely upon,

First, one of the suggested tests, the large amount involved, $33,750.

Second, upon another as to the necessity of further details not mentioned in the original conversation but incorporated in the written instrument, such as the kind and quality of potatoes, the provisions as to sacking, the time of paying the balance of the purchase price, as to unavoidable accidents, weather conditions, car shortage, and necessary extension of time of delivery caused thereby.

Third, upon the fact that the conversation bound only the defendants to sell, while the written agreement bound also the plaintiff to buy.

Such in brief are the contentions of the defendants on this preliminary question of whether the parties intended the trade between Higgins and Colbath to constitute the completed contract. These contentions are in sharp conflict and the issue was one of fact. As this court said in a recent case, "It is settled that the fact that parties negotiating a contract contemplate that a formal agreement shall be made and signed is some evidence that they do not intend to bind themselves until the agreement is reduced to writing and signed. But, nevertheless, it is always a question of fact, depending upon the circumstances of the particular case, whether the parties had not completed their negotiations and concluded a contract definitely complete in all its terms which they intended should be binding upon them and which for greater certainty or to answer some requirement of law they designed to have expressed in a formal written agreement." *Berman* v. *Rosenburg*, 115 Maine, 19, 25.

Unless, therefore, a verdict for the plaintiff could not stand the case should have been submitted to the jury to determine this controverted question of fact, unless further, even conceding the existence of a concluded oral contract there was no sufficient memorandum of it signed by the party to be charged, the defendants, to remove it from the ban of the Statute of Frauds.

II.    This brings us to the second main issue, which is one of law. Granting that the jury find there was a concluded oral contract, was there a sufficient memorandum to satisfy the statute?

1.   Obviously the letter of March 1 from Higgins to the plaintiff is entirely inadequate.   It contains none of the essential elements of the contract except the quantity.   The price, time of delivery and terms of payment are lacking.   It does not profess to be more than a confirmation of the execution of the order given by the plaintiff to Higgins & Company by telephone.   It cannot do duty as a sufficient memorandum.   It is too meagre.   *Thurlow* v. *Perry*, 107 Maine, 127.

2.   But in our opinion the full memorandum drawn by Mr. Higgins on March 1 does meet the requirements and contains all the terms of the oral trade.   True it covers them in amplified and formal language, but that is no objection.   The fact that it also contains details not embraced in the contract itself does not destroy its force as a memorandum whether those additional provisions are agreed to or not.   It may contain more than the original terms, provided the parties agree to them, but it cannot contain less.   Oftentimes the memorandum in writing is gathered from correspondence between the parties, and the fact that the letters contain matters other than the terms of the oral agreement is immaterial.   Its purpose is to express the terms of the original trade and is evidence by which that trade can be proved.   *Bird* v. *Munroe*, 66 Maine, 337.   The rights of the parties must be ascertained from the memorandum without resort to parol testimony.   *Williams* v. *Robinson*, 73 Maine, 186. With all these requirements this memorandum complies.   The vital inquiry is whether there exists a memorandum signed by the party to be charged containing the essential terms of the oral contract. This memorandum contains not only the essential terms but all the terms of the trade as orally agreed upon and is signed by the party to be charged, the defendants.

It must be borne in mind that we are not discussing the validity of the document as a written contract.   It is admittedly invalid in that capacity.   Nor are we here considering its evidentiary weight as showing that the parties contemplated a written contract to be made.   That is a question for the jury under the first branch of this opinion which we have already discussed.   We are examining it to ascertain whether it can serve as a sufficient memorandum assuming a contract has already been made, and in this capacity we think it is adequate.

The situation then is this.   The order of nonsuit took from the jury a vital question of fact, on which there was a serious conflict of

evidence. Were the jury to decide that point in favor of the defendants then the legal question of the adequacy of the memorandum would not arise, and the defendants would be entitled to judgment. If the jury should decide the question of fact in favor of the plaintiff, then, as the memorandum is adequate, the plaintiff would be entitled to judgment so far as this point is concerned. Under these circumstances to withdraw the case from the jury on the question of fact was reversible error. The legal rights of the parties require the entry to be

*Exceptions sustained.*

NOTE. MORRILL, J. I am unable to concur in the opinion by the Chief Justice.

I agree that ordinarily the question whether in a given case there has been a completed oral contract between the parties, is for the determination of the jury. But in the present case a verdict for the plaintiff upon that issue could not, in my opinion, have been sustained.

The testimony of Mr. Higgins, relating his conversation with Mr. Colbath on March 1, clearly shows that it was the understanding of both that the agreement was not binding until reduced to writing, signed and the deposit of one dollar a barrel paid. I cannot see how any other construction of their words can be sustained; and the subsequent acts of Mr. Higgins, and the attempts of the parties to reach a satisfactory contract are consistent with such construction, and none other.

The cases cited by Judge Emery in *Steamship Company* v. *Swift*, 86 Maine, 248, illustrate the different phases of the general question, and several of them are directly in point here.

The burden of proof to show a completed oral contract is upon the plaintiff, and his case fails there, upon the testimony of Mr. Higgins and Mr. Upton. Neither undertakes to say that it was the intention that the telephone conversation between Mr. Higgins and Mr. Colbath should constitute a completed contract; it would have been competent for Mr. Higgins to so testify, if such were the fact. *Edwards* v. *Currier*, 43 Maine, 474. *Faxon* v. *Jones*, 176 Mass., 206, 209. *Rand et al.* v. *Michaud*, 122 Maine, 65. All outward manifestations of intention negative the contention that the telephone conversation was intended as a completed oral contract.

I think that the nonsuit was rightly ordered.